# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of Information associated with the cellular telephones assigned phone numbers 720-784-1287 and 303-596-8026 ("the Accounts"), that are stored at premises controlled by T-Mobile ("the Provider"), which is headquartered at 4 Sylvan Way, Parsippany, NJ, 07054. | Case No. 24-sw-1282-MEH |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the State and District of New Jersey, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) and 2 | Interference with Commerce by Threats or Violence (Hobbs Act Robbery), and Aiding and Abetting; |
| 18 U.S.C. § 924(c)(1)(A)(ii) and 2 | Possessing/Brandishing a Firearm during and in Relation to a Crime of Violence, and Aiding and Abetting; |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearm and Ammunition |

The application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Christopher Pyler*
*Applicant's signature*

TFO Christopher Pyler, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 09/19/2024

*[signature: Michael E. Hegarty]*
*Judge's signature*

City and state: Denver, CO

Michael E. Hegarty
Chief United States Magistrate Judge
*Printed name and title*

# ATTACHMENT A

**DESCRIPTION OF LOCATION TO BE SEARCHED**

This warrant applies to records and information associated with the cellular telephones assigned phone numbers **720-784-1287 and 303-596-8026** ("the Target Accounts"), that are stored at premises controlled by **T-Mobile** ("the Provider"), headquartered at 4 Sylvan Way, Parsippany, NJ, 07054, from July 1, 2024, to August 22, 2024.

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

**I. Information to be Disclosed by the Provider**

1. Historical and Subscriber Information - To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period between

**August 14, 2024 (06:00 UTC) through August 21, 2024 (18:00 UTC):**

a. The following information about the customers or subscribers of the Account:

i. Names (including subscriber names, usernames, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long-distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

2. Historical Call/Text/Data Detail Records with Location Information - All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Accounts, including:

a. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. All historical location information, including data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Accounts for the time period of August 14, 2024 (06:00 UTC) through August 21, 2024 (18:00 UTC).

3. Specialized Location Records - All call, text, and data connection session location information, related to all specialized carrier records that may be referred to as NELOS (Network Event Location System), LOCDBOR (Location Database of Record), RTT (Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Distance of Arrival) or Timing Advance Information (also known as TrueCall), Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and Sector of the device in relationship to the network when connected to the network with the identified mobile number account, from August 14, 2024 (06:00 UTC) through August 21, 2024 (18:00 UTC), including:

a. Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, web site and/or application connections, and cell site information; and

b. List of all cell-sites as of August 1, 2024, for all state(s) in which the above records used cell locations. Cell site lists shall include switch, cell-site number, name, physical address, longitude and latitude, all sectors associated with each cell-site, sector beam width, tower height, and azimuth of each sector associated with each cell-site. If multiple technologies (CDMA, UMTS, GSM, LTE etc.) are referenced in the records all appropriate corresponding cell site lists will also be preserved.

**II. Information to be Seized by the Government**

1. All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1951(a) and 2, Interference with Commerce by Threats or Violence, and Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(ii) and 2, Possessing/Brandishing a Firearm during and in Relation to a Crime of Violence, and Aiding and Abetting; and 18 U.S.C. § 922(g)(1), Felon in Possession of Firearm and Ammunition committed on August 20-21, 2024, including historical location information.

2. Pursuant to § 2703(g), the presence of an agent is not required for service or execution of this warrant.

3. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

**AMENDED AFFIDAVIT**

I, Detective Christopher Pyler, a Task Force Officer assigned as an investigator with the Federal Bureau of Investigation (FBI) Rocky Mountain Safe Streets Task Force, being first duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

**INTRODUCTION AND AGENT BACKROUND**

1.  Your affiant, Detective Christopher Pyler, hereby informs the Court that he is a commissioned peace officer with the Westminster, Colorado Police Department, and is currently assigned as a federal task force officer with the FBI Rocky Mountain Safe Streets Task Force ("RMSSTF"). Your affiant is responsible for investigating violent crimes in the Denver metropolitan area, including bank and business robberies, kidnappings, carjackings, and weapons violations. Your affiant has been a police officer in Colorado for more than thirty years and has training and experience in the investigation of property crimes, financial crimes, and violent crimes, and has been assigned to the RMSSTF for more than nine years. Your Affiant has investigative experience and has authored numerous search warrants in cases involving physical and electronic evidence.

2.  This affidavit is made in support of an application for a search warrant for information associated with cellular telephones assigned phone numbers **720-784-1287 and 303-596-8026** (the "**Target Telephones**"), that is stored at premises controlled by T-Mobile ("the Provider"), a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ, 07054.

3.  The information to be searched is described in the following paragraphs and in

1

Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require the Provider to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

4. The facts in this affidavit come from your affiant's personal observations, training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all your affiant's knowledge about this matter.

5. Because this affidavit is being submitted for the limited purpose of securing a search warrant, your affiant has not included each and every fact known to your affiant concerning this investigation. Your affiant has set forth facts your affiant believes are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of a violations of 18 U.S.C. § 1951(a) and 2, Interference with Commerce by Threats or Violence (Hobbs Act Robbery), and Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(ii) and 2, Possessing/Brandishing a Firearm during and in Relation to a Crime of Violence, and Aiding and Abetting; and 18 U.S.C. § 922(g)(1), Felon in Possession of Firearm and Ammunition are located in the place described in Attachment A. Your affiant believes there is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and there is probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes as further described in Attachment B

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated. See 18 U.S.C. § 2711(3)(A)(i).

## INVESTIGATION

7. The United States, including the Federal Bureau of Investigation, is conducting a criminal investigation of Brandon Mosley and other unidentified suspects for violations of 18 U.S.C. § 1951(a) and 2, Interference with Commerce by Threats or Violence (Hobbs Act Robbery) and Aiding and Abetting; 18 U.S.C. § 924(c)(1)(A)(ii) and 2, Possessing/Brandishing a Firearm During and in Relation to a Crime of Violence, and Aiding and Abetting; and 18 U.S.C. § 922(g)(1), Felon in Possession of Firearm and Ammunition.

8. On August 20, 2024, at about 11:58 p.m., three robbers entered the Pizza Hut restaurant at 8801 East Montview Avenue, Denver, Denver County, Colorado. According to victim, M.H., one robber, described as a Black or Hispanic male, about 5'5" tall, wearing a purple hoodie, black pants, and a black mask (hereinafter Robber 1), entered the store and pointed a handgun with a flashlight mounted on it at his stomach and demanded the property from his person. Two other robbers confronted the second victim, T.C., at the front door when she returned from delivering a pizza to a customer. T.C. described the robbers at the door as a taller Black male (possibly light skinned) wearing a "CK" white/black/gold hoodie, a black ski mask, and armed with a black handgun (hereinafter Robber 2) and described the last as a short black male wearing all black, a black ski mask, and armed with a black handgun (Robber 3). T.C. said she told the robbers she did not believe the guns were real and to "fuck off" and said the third robber (Robber 3) hit her in the face with the handgun and said it was real. Responding officers noted T.C. had visible injury to her face. The robbers demanded the money from the safe, and T.C. told them she was a traveling manager and did not have access to the safe. The robbers fled without obtaining anything of value

3

from the store. Your affiant was aware from his training and experience that Pizza Hut is an international company with locations across the world (more than 19,000 restaurants across 105 countries) and engages in interstate commerce.

9.      Your affiant reviewed the video surveillance footage of the robbery. T.C. could be seen exiting the store to deliver food to a customer in a vehicle parked in the parking lot in front of the store. The three robbers walked up and two robbers (Robber 1 and Robber 3) walked inside and could be seen confronting M.H. Robber 1 pointed a handgun with a flashlight mounted on it at M.H. Robber 1 and 3 escorted M.H. to the front door where T.C. and Robber 2 were standing. Robber 1 (not Robber 3 as described by T.C.) could be seen striking T.C. with the handgun and then all of the robbers, T.C., and M.H. re-entered the store where Robber 1 continued to brandish the handgun and point it at T.C and M.H. T.C. and M.H. appeared to comply with the robber's demands, but the robbers fled a short time later without obtaining anything of value from the store. While Robber 1 pointed the handgun at T.C. and M.H., Robber 3 walked toward the back of the store, and Robber 2 stood by the front door. Images of the robbers are shown below. In some frames of the video surveillance footage, the robbers are seen wearing gloves and Robber 2 (whose hoodie appeared to have a Nike "swoosh" on it) can be seen wearing what appear to be blue/purple rubber gloves (shown below). In the video surveillance footage, Robber 2 and Robber 3 were not seen with handguns.

Robber 2          Robber 3   Robber 1          Robber 2



10. On August 21, 2024, at about 0012, Denver Police officers were checking the area of the Pizza Hut robbery and observed a subject matching the description of one of the robbers (Robber 2) fleeing the Domino's Pizza at 8031 East Colfax Avenue, Denver, Denver County, Colorado, and getting into a red Chevrolet sport utility vehicle. The Domino's Pizza was 1.1 miles from the Pizza Hut which was robbed. The two other robbers fled on foot. The officers, in a fully marked Denver Police car equipped with police markings, emergency lights, and sirens, attempted to stop the vehicle and the vehicle fled from them at a high rate of speed, at one point driving into oncoming traffic on Colorado Boulevard (a major throughfare), and continued south to East Virginia Avenue, where officers were able to complete a successful "Pursuit Intervention Technique" and stop the vehicle. The driver was taken into custody after a brief struggle. It was determined the Domino's Pizza had been robbed by three robbers matching the descriptions of the suspects who robbed the Pizza Hut minutes before the Domino's robbery. Robber 2 is clearly wearing a hoodie with the Nike "swoosh" and blue/purple latex gloves. The robbers are shown below and labeled in the same manner as the Pizza Hut robbers pictured above.

Robber 3    Robber 1                              Robber 2

 

11. The driver (and only occupant) in the red Chevrolet was identified as BRANDON J. MOSLEY. MOSLEY was wearing clothing consistent with that of Robber 2 and was wearing blue/purple rubber gloves at the time of his arrest. A black mask was found on the ground just outside the driver's door and MOSLEY had U.S. currency in his hoodie pocket when he was searched incident to arrest. Found inside the red Chevrolet driven by MOSLEY, in a pocket on the back of the front passenger seat, was a loaded Springfield XD9 semiautomatic pistol with a cartridge in the chamber and a loaded magazine (pictured below). Inside a backpack in the Chevrolet were two additional loaded firearm magazines, a scale, small baggies, and a blue bandana and hat. Also located in the backpack was identification in the name of Fernando Saul Velasquez. Your affiant knows from training and experience that Springfield firearms are not manufactured in Colorado and necessarily traveled in interstate commerce. In the bodycam footage of the arrest, MOSLEY can be heard yelling at officers to retrieve his phone from inside the Blazer. Two cellular phones were located inside the vehicle and seized as evidence pending an application for a search warrant.





12.     The victim of the Domino's robbery, J.S., reported he saw the three robbers come to the door and thought the door was locked, but they were able to enter the store. One of the robbers, a Hispanic male (with a Spanish accent) held him at gunpoint and said the second robber was a Hispanic female (based on a slim build and Spanish accent). The male robber hit J.S. in the face with the pistol and demanded he open the safe. J.S. complied and the robber was able to take a bank bag from inside the safe. A store manager believed the bag contained about $1,000 in U.S. currency that was under the care and control of Domino's Pizza. Your affiant was aware from training and experience Domino's Pizza is an international corporation with over 15,000 restaurants in more than 83 countries across the world and engages in interstate commerce.

13.     Your affiant reviewed the video surveillance footage from the Domino's restaurant. Your affiant could see the three robbers were the same suspects who attempted to rob the Pizza Hut minutes earlier based on their physical descriptions and clothing. The video surveillance showed Robber 1 and Robber 3 enter the store. Robber 3 confronted J.S. first while Robber 1 ran to another

7

area of the store. Robber 3 escorted J.S. to a cash drawer and J.S. could be seen opening it. Robber 3 had his right hand near his waist when he confronted J.S., and it was not clear if he was armed with a weapon (although J.S. said two of the robbers were armed with handguns). Robber 1 was armed with a handgun (with a flashlight attachment) and was brandishing it as he confronted J.S. Robber 1 escorted J.S. to a safe where J.S. opened the safe and Robber 1 reached in and removed what appeared to be a cash bag.

14. Your affiant learned inside the safe was another locked compartment on a time delay which contained more currency. While Robber 1 dealt with J.S., Robber 3 opened a door and let Robber 2 into the store and then left. Robber 3 can be seen leaving the store on exterior surveillance cameras at that time. Robber 2 remained near the door while Robber 1 was waiting for J.S. to open the locked compartment. Robber 2 can be seen taking U.S. currency from the open cash drawer and putting it into his hoodie pocket. During this time, Robber 1 can be seen physically pushing J.S. and striking J.S. with the handgun one time. J.S. had visible injuries to his face when officers interviewed him.

15. Robber 1 and Robber 2 did not wait for the time delay compartment to open and left the store, where the vehicle pursuit ensued.

16. Denver Police officers conducted a "show-up" or field identification with the victims of both robberies, having them look at MOSLEY and his clothing. The two victims of the attempted robbery at Pizza Hut (T.C. and M.H.) were not confident MOSLEY was involved in the robbery at Pizza Hut, but J.S. said "he [MOSLEY] could be" and was "90% sure" MOSLEY was involved in the armed robbery at the Domino's Pizza.

17. On August 28, 2024, your affiant applied for and was granted a search warrant for the two cellular phones collected from the red Chevrolet. During his arrest, Mosley demanded

8

officers take his phone from the car, so your affiant believes at least one of the phones belongs to Mosley and believes the other cellular phone likely belongs to one of the other two robbers. Your affiant was able to extract some data from both cellular phones, and determined the numbers associated to the cellular phones were 303-596-8026 and 720-784-1287. Commercial databases showed the subscriber for the 303-596-1287 phone number as "Brandon J Mosley." Other data extracted from the cellular phones led your affiant to believe the cellular phone with number 303-596-8026 was likely Mosley's. In the data, your affiant located a user account named "readylocc8@gmail.com" and your affiant was aware from his investigation that Mosley had a Facebook social media account in his name and that his "vanity" name on the account was "Ready Loc." Commercial databases showed the subscriber for the 720-784-1287 phone number as "Anali Velasquez." In the data on the second cellular phone, 720-784-1287, your affiant found two user accounts "fernyvelasquez31@icloud.com" and "fernlxcesctgc30@icloud.com", both of which appear to be variations of Fernando Velasquez (which the name on the identification found in the backpack in the red Chevrolet). Your affiant noted the phone number 720-784-1287 was associated to a suspect in an aggravated robbery investigation that occurred in Northglenn, Colorado, on May 29, 2024. The victim was communicating with the suspect at that number to meet to sell the suspect some shoes. When the victim arrived, two males approached him and one of the males pointed a firearm at the victim and took the shoes. That case is still under investigation by Northglenn Police.

18. On September 11, 2024, the grand jury indicted MOSLEY for two counts of Interference with Commerce by Threats or Violence (Hobbs Act Robbery) and Aiding and Abetting the same in violation of 18 USC §§ 1951(a) and 2, one count of Using and Brandishing a Firearm During and in Relation to a Crime of violence and Aiding and Abetting the Same in violation of 18

9

USC §§ 924(c)(1)(A)(ii), and one count of Felon in Possession of a Firearm and Ammunition in violation of 18 USC § 922(g)(1) in case 24-cr-277-NYW.

19.     On September 11, 2024, your Affiant was granted a search warrant for the records requested in Attachment A. The search warrant was granted by Chief United States Magistrate Judge Michael E. Hegarty. Your Affiant prepared to serve the search warrant to the provider, T-Mobile, via email and noted that while Attachment A was correct, Attachment B was incorrect in that the data requested was for a cellular phone and the data contained therein, and not the records maintained by the cellular provider, T-Mobile. This corrected affidavit and search warrant were prepared to be resubmitted for review.

## THE PROVIDER

20.     Your Affiant searched law enforcement databases to determine the carrier of the Target Telephones, 720-784-1287 and 303-596-8026, and determined T-Mobile was the servicing carrier for the time period related to this investigation for both Target Telephones.

21.     In your affiant's training and experience, each phone carrier develops and maintains specialized location services to enhance cellular coverage. These records may be referred to as NELOS (Network Event Location System), LOCDBOR (Location Database of Record), RTT (Real Time Tool), PCMD (Per Call Measurement Data), TDOA or Timing Advance Information (also known as TrueCall), Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information.

22.     Specialized location records are necessary in this case because they can provide further location information concerning the **Target Telephones**, as well as location information associated with data usage on the **Target Telephones**. Location information associated with data usage on the **Target Telephones** is particularly relevant in this case because your affiant's

10

investigation indicates specific locations at or about a specific date and time.

23. In your affiant's training and experience, your affiant has learned that T-Mobile is a company that provides cellular telephone access to the general public. Your affiant also knows that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."

24. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

25. Based on your affiant's training and experience, your affiant knows T-Mobile can collect cell-site data about the Target Telephones. Your affiant also knows that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. Based on your affiant's training and experience, your affiant believes that T-Mobile currently possesses the specialized location records concerning the Target Telephones.

26. Based on your affiant's training and experience, your affiant knows that wireless

11

providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. Your affiant also knows that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In your affiant's training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Telephones user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

27.     Based on the foregoing, your affiant requests that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

28.     Your affiant further requests that the Court direct the Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on the Provider, who will then compile the requested records at a time convenient to it.

29.     Your affiant also requests that the Court direct the Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Provider's services.

12

## CONCLUSION

30. Your affiant declares under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Respectfully submitted,

*s/Christopher Pyler*
Christopher Pyler, Task Force Officer
Federal Bureau of Investigation - Denver

SUBSCRIBED and SWORN before me this __19th__ day of __September__, 2024.

_____
HON. MICHAEL E. HEGARTY
CHIEF UNITED STATES MAGISTRATE JUDGE

**Application for search warrant was reviewed and submitted by Brian Dunn, Assistant United States Attorney.**

13